All right, let's pick up People v. Stamps. Please proceed when you're ready, Counsel. Thank you, Mr. Court. Counsel. My name is Maggie Kime, and I represent the defendant, Mr. Eskel Stamps, in this matter. This is his direct appeal from a first-degree murder conviction based on a shooting death. Now, in the brief, there are four errors. The state has conceded the fourth, which is a simple credit issue, and I'll be focusing on Arguments 1 and 2, although I'm happy to take questions on anything in the briefs. Now, the shooting occurred late at night amidst heavy drinking. Mr. Stamps was out with Ms. Shantiza Goodwin-Brown, the only occurrence witness, and with Mr. Finanza or Nan Beard, the decedent. According to the witness, Mr. Beard had begun acting foolish and was too drunk at the club, so the group left. They had all been drinking very heavily. Mr. Stamps was driving with the witness beside him, and Mr. Beard seated behind him. The group stopped on the way home to pick up the witness's child at a friend's house, and at some point during the drive home from here, Mr. Beard began pretending to have a gun and threatening to shoot Mr. Stamps. Mr. Stamps pulled the car over, and both men got out. Now, at this point, the witness did not see or hear what happened outside of the car, and she didn't see who took the gun and never saw anyone with the gun. She even acknowledged that it could have been Mr. Beard, who saw the gun in the car and grabbed it. She heard the gun go off, Mr. Stamps went back into the car, and Mr. Beard was dead from a single gunshot wound. Now, after the shooting, Mr. Stamps drove the witness to drop her child off at her grandmother's house, then he returned to the scene. He didn't dispose of the gun, and when police arrived, he didn't flee. He instead immediately cooperated. Once in police custody, Mr. Stamps was interrogated twice by Orlando Ward and Brian Cook. During the course of these interrogations, it became clear that Mr. Stamps had no memory of the end of the night, no memory of the shooting, of getting the gun, no memory of being transported to the police station or of being tested for GSR. The other witness had similar issues of memory, all due to the drinking. She couldn't even remember initially that the child had been picked up before the shooting occurred. Now, there was a third and separate interrogation of Mr. Stamps in which John Vito Parisi administered a lie detector test. There were no results or information on this lie detector test because apparently the apparatus crashed after it was given. In this case, the central issue for this jury was going to be whether that gun could have just discharged accidentally in a drunken struggle and whether the evidence of extreme drunkenness could negate the state's proof of mens rea. And while the jury found Mr. Stamps guilty, we're asking this court to reverse for a new trial where the jury saw evidence indicating that Mr. Stamps had failed a lie detector test and where the jury was erroneously instructed that an intoxicated person is criminally responsible for their conduct when they voluntarily drink. Turning first to the issue of the lie detector, since the 80s, the Supreme Court has been very clear that they do not want juries hearing when a lie detector is used during a police investigation. This is because this information overwhelms the jurors' ability to engage as independent back finders. It's simply too powerful. Yet in this case, the jury could readily infer from People's Exhibit 14 that Mr. Stamps had, in fact, failed a lie detector. While the word lie detector or polygraph, none of these words were used, the jury actually saw Mr. Stamps with the wire connecting him to a laptop immediately before hearing him repeatedly contradicted by a detective and accused of being dishonest. Now, no court has yet approved of showing a defendant hooked up to a lie detector apparatus in this way. Indeed, in People v. Mason, simply using the words technician, examiner, and results were giving the jury enough information from which they could infer that a lie detector had occurred so the appellate court reversed. Here, we have jurors seeing a brand new investigator coming from a different police force conducting an entirely independent interview. At the beginning of the interview, the investigator tells Mr. Stamps to switch chairs. Immediately after that, we see the laptop open and the wire connecting Mr. Stamps to the laptop. We then see Parisi conduct a very different style of interview than what Polk and Ward had conducted because Parisi repeatedly contradicts Mr. Stamps and tells him that he's not telling the truth, that he was consciously remembering things that he kept denying remembering, and all the while, Parisi is periodically consulting the laptop, at one point going so far as to just shred it with a pencil. Now, in context, the jury could have no better explanation for this unique third interview than that Mr. Stamps had failed a lie detector test. In Taylor, the Supreme Court reversed the trial court due to the possibility that the jurors could infer the defendant took a lie detector even though there was no evidence they had heard the defendant actually took one. There, the jurors knew from pretrial that a completely different suspect had been given a lie detector, and not all the jurors, but just some from pretrial publicity. The court reasoned that the risk was simply too great in knowing that lie detectors had been used during the investigation, that the defendant had been given one, and because he was on trial, he had failed. Now, notably, in Taylor, the jurors affirmed to the trial court that they could be fair and that they could disregard all information that they learned prior to trial, including this other suspect who took a lie detector. And the court said that even though they had affirmed these things, you still needed to reverse and get a fair trial where jurors had no information about a lie detector being used during the investigation. And this is because of the power of thinking that a lie detector has occurred. Its suggestion is so powerful that it biases the jury and it takes away any possibility of a fair trial. And in this case, there was simply no reason for putting in this video. There was no new information, no probative value. Mr. Stamps had already admitted his presence, he'd already acknowledged the gun that he used that was all available from other evidence, and he consistently said in the preceding interview that he suffered from memory loss, that he did not consciously remember, yet they put it in anyways. How long was this video? What was the writing time on it? I believe the redacted version was between 15 and 20 minutes, but I can't exactly remember. I haven't seen the record recently. And how much video did the jury see in total of these? I think the redacted version was 15 to 20 minutes. Now, you only see Mr. Stamps... You know what I'm saying? They saw other videos of other interrogations in addition to the lie detector section. I'm just wondering, how much video did the jury see and try to get a feel for how long this was in comparison to the other video? Yeah, I did not check my record notes on that. I would guess that the initial Warren Koch interrogation was about 30 minutes and then their second interrogation was much shorter, was only about 6 minutes long. And did the jury hear the words lie detector test? They didn't hear the words lie detector test, but the same was true in Mason. The strangest thing is that they saw this laptop with the wire coiled next to it and then with the wire leading to Mr. Stamps and then with the wire again coiled next to it. So my question if I were the juror would be, what is this wire? Why is this detective, this new detective here, why is he looking at this computer? What is he telling us? I think the obvious answer is that this is a lie detector. Now, it's in light of Taylor and all of these Supreme Court cases that say this information is just too powerful, we can't risk letting the jury infer this, that we're asking this court to reverse and give a new trial without this redacted videotape. I also think it's worth noting that in this case, because there was no new information from this videotape, the prejudicial value greatly outweighed any probative value, so also under Rule 403, this should have been kept out. Now, there's a second completely independent means for reversal, and that's the non-IPI instruction on intoxication. Mr. Stamps' level of intoxication was central to the defense theory that the state had insufficient proof of the requisite mens rea for first-degree murder. Now, since before 1954, voluntary intoxication has been a defense for specific intent crimes when it negates mens rea. In 2002, there was an affirmative defense that was eliminated by the legislature, but in the notes, it becomes clear that they acknowledge the continued relevance of this information in rebutting mens rea. They just didn't want the defense to be allowed to seek an instruction on it. But here, the jury instructed that an intoxicated person is criminally responsible for conduct unless the condition is involuntarily produced. This is an incorrect statement of law because it implies that intoxication, when voluntarily produced, leads to criminal responsibility. And because it gives a special definition of criminal responsibility, even when it's read in conjunction with other instructions, it seems to change the state's burden of proof of mens rea. And for that reason, we'd ask that this court reverse and let Mr. Stamps have a trial where a jury considered his intoxication without being told that it leads to his criminal responsibility. Are there any questions? I don't believe so. Thank you, counsel. Argument for the state. May I please report, counsel? My understanding is that this microphone does not amplify my voice. That's correct. It's just recording you and not amplifying. I'm going to try to follow the same format as defense counsel and try to respond to some of the questions the court's already had. And could you make your appearance for the record? Jim Rangers, I'm from Springfield in the appellate prosecutor's office. Excuse me. The standard for whether or not this redacted portion of the video would be admitted as an abuse of discretion, whether or not the judge's decision was arbitrary, fanciful, or unreasonable, something no reasonable person would do. I think the court was getting at previously that this section with this wire is less than a minute, I think. It's a very short amount of time. Counsel said it was 30 minutes. I think it was 20 minutes, 30-plus, 6 minutes. I don't know if she was avoiding the answer or misstating the answer or is confused about the video, but you can look at it. The portion with that little wire that goes from a laptop to under defendant's long-sleeved black shirt is, I think, less than a minute, maybe a few seconds. During that time, this officer is really asking defendant about his guilt, and he continues to deny everything. So there's a little bit of crocodile tears going on here. Defendant did not want to testify. The defense counsel was stuck with the defendant that did not want to testify, so perhaps she wanted a video in there to get his side of the story out without calling him as a witness, which she couldn't do without his permission. And there was a hearing. The judge redacted everything except for that little wire. That's all it is. Nobody ever said lie detector. When you think of a lie detector, you think of a guy sitting in a chair with some type of a strap across his chest, and he's wired up to a machine over there, and there's some guy who looks like a professor, maybe, with these little instruments recording swiggly lines. That's what a lie detector is. This is a laptop. I mean, I'm probably the least knowledgeable person in the room about modern technology, but everywhere I go there's a laptop. I had breakfast this morning, and people are looking at laptops. People drive looking at laptops, looking at phones, texting at phones. It's not a lie detector machine. It's a laptop. I think that's a ridiculous issue, but even if the court finds some merit here, what we have, bottom line, is the defendant called the deceased mother. Counsel, before you leave that, let me go back and ask one question. This redaction process, was that the result of a motion limineer filed by the defendant? Yes, it was limineer suppressed. Pre-trial motion, yes. They wanted the whole thing thrown out, and the whole thing was thrown out. What it comes down to is a wire. There's a wire that runs from the laptop. The defendant's sitting there with a long, sleeved black shirt. It goes, I don't know exactly where it goes, under the shirt. Now, from that, they go into this lie detector argument. I have been at this for a long time, and I never heard of a defendant calling the deceased mother beforehand and saying, I'm going to kill this M.F. This is the first time I've heard that. In addition to that, I'm going to refer to the lady involved as Sean, because that's how defendant refers to her in the video, which is a shorthand version of her name. She said, you didn't just shoot my baby's daddy, because she and the deceased shared a baby. And defendant said to her, that's what you get. A defendant's gun is found under his seat. The bullet fragment from the deceased matches the gun. It was fired at close range, right above, right into the left eyelid. There was stifling. The path of the bullet went straight back through the brain. All these show determination to kill, intent to kill. So if there is any error because of this wire, it was harmless. The other issue counsel raised here is this instruction. And that instruction is word for word, 720 ILCS 5-6-3, which was passed in 2002, which says you cannot use voluntary intoxication as a defense. I attended a seminar recently, and the judge addressing this identified himself as a member of the Committee on Supreme Court Instructions. And I pointed out to him the difference between this statute and the present IPI instructions, and he said the instructions are out of date, that they had not caught up, and that they serve the function for cases of an older nature. And counsel, this non-IPI was offered by the state? Yes. And does the record show, was there any modifications to it? When it was offered, was there an objection made, and was it modified? Yes, there was a debate between defense counsel and the prosecutor. This intoxication, this drinking was woven all throughout the fact. But there was a debate. The prosecutor removed this instruction, basically saying you can't use voluntary intoxication. Defense counsel wanted two instructions. I think one was IPI intent, one IPI knowledge. The judge finally, I think, compromised and said he'll put in all three. Well, counsel, the phrase that's in the non-IPI is the word criminally responsible for conduct, and it is the defendant's argument that that phrase, when read with all the other instructions, that it implies that when the defendant got intoxicated, he intended and therefore is responsible for everything that followed. How do you answer that argument? I would answer it two ways, Your Honor, two or three ways. One, I put in my brief, and I put them in verbatim with emphasis, I think 19 times that the jury was instructed that they had to find that the defendant, the jury, defense counsel, and the prosecutor instructed. I put it on 19 times. I think it was 25 times, actually. You have to find that he intentionally did this. You have to find that he knowingly did this. And also I think I put in my brief a comment by defense counsel during closing. Excuse me. It's page 800 for the convenience of your staff. I don't know if I can find it right off. I think it's worth reading. This is the defense counsel during closing. It's not very long. You can take into account the effect of intoxication. The state has to prove both the facts and the mental state, and they have to prove the mental state beyond a reasonable doubt. If his intoxication was affecting his ability to form the appropriate intent, then you can consider that. Now, they were trying to use it as voluntary intoxication. A lot more polite. Didn't know what he was doing. And if they're ‑‑ I answered the judge by saying there were 25 times they said you had to find it. You have this defense instruction, and then you have the prosecutor on rebuttal. We understand ‑‑ no, I'm sorry. That's the defense. Yeah, here. Prosecutor rebuttal. Ladies and gentlemen, Ms. Craig, defense counsel, has indicated that you can get so drunk that you aren't capable of forming the intent to commit a crime. And that is true, ladies and gentlemen, one of the elements in this case, and the people must prove to you the defendant had the mental state when he fired the shot to kill the victim. So I think it was clear, given all these instructions, what the jury had to do to find the defendant guilty. In any event, they all had to be read together. In any event, with this kind of overwhelming evidence of guilt, I don't think it would have any effect on the jury's verdict. Now, they're going to get up here and say, oh, well, no one saw the defendant actually shoot the deceased in the head. Well, yeah, but there's a reasonable inference. There's nobody else there. There's a gunshot. He called his mother beforehand and said, I'm going to kill this M.F. right after the gunshot. John testifies that she said, you didn't kill my baby's daddy. He said, that's what he gets. So I think it's pretty strong circumstantial evidence that he shot the deceased and did so with intent to kill her. The other way. Thank you, counsel. Rebuttal arguments. So first I'd like to clarify that the wire, which leads from the laptop to Mr. Stamps, I hope I was clear, it only connected him for a very brief time, but it's in looking at the style of questioning and the type of assertions made by Parisi that even having the wire for a brief time becomes important to this argument. The same standard of use of discretion, I think, was at play in the Taylor case, and it would have been at play in the Mason case. And in Mason, there was no mention of the word lie detector, so I would encourage you to look at those cases closely. And the final thing on the lie detector is just that counsel suggested that maybe defense counsel wanted to get this video in after it was redacted to get on Mr. Stamps' side of the story. That's absolutely incorrect because counsel objected even to the redacted version for exactly the reasons that we are saying it was improper to let them in here. Showing the wire, all of this, was too much information, which insinuated that there had been a lie detector. Now, moving back to the instruction, I think it's important to note that the defense of voluntary intoxication predated the affirmative defense in Illinois. And it was the legislature which updated the affirmative defense statute first to include voluntary intoxication and then to take out that language, but they put no language into the statute to imply that this evidence is somehow irrelevant. And there are other states, like Montana, which we cited in the brief, who give examples of how the legislature can use language to say this evidence is totally irrelevant, but that didn't happen here. Here, legislative history is very clear that the legislature still expected voluntary intoxication to remain relevant to exculpating the defendant, not to inculpating him. But when you look at the instruction that was given in this case, it gives an involuntary intoxication instruction, but it takes out the word voluntary. And the end result from doing that is that it tells the jury the conduct at issue of an intoxicated person leads to criminal responsibility because they voluntarily got drunk. And that's exactly the problem with this instruction. And when you look at the elements instruction, it lays out the first element of the conduct that needs to be proven by the state, and then it lays out the mens rea instruction. And it's when looking at this elements instruction in conjunction with a criminal responsibility instruction that you can see how the law would have become confused for the jury. And we pointed in the reply brief to the example of People v. Pinkney, where the jury was trying to decide whether the defendant was liable for a brutal beating death for his co-defendant's blows in the beating. And as a result, the jury heard the accountability instruction, which was a proper instruction. But they also heard a causation instruction, which seemed to change the accountability instruction and simplify it down so that the defendant would be liable for the co-defendant's acts just if they were connected. And the health court recognized that even though the proper instruction was given, the way these instructions work together led to confusion. And I think the same thing is happening in this case. No matter how many times you say mens rea is required, mens rea is required, if you're giving this broad intoxication instruction, which purports to define a special case of criminal responsibility, it's going to influence how the jury is applying mens rea in this case. Now the state points the prosecutor's argument in rebuttal into the defendant's argument in closing, saying that these made sure that the jury knew what criminal responsibility meant and that it didn't negate or that it could negate mens rea. And maybe if there had been known statements by the parties, that would be an acceptable solution to this, the problem in this case. But the prosecutor didn't just say, oh yeah, the defense is right on this. Starting in voir dire and all the way through closing, they were hammering away on this instruction, that you are criminally responsible for your conduct if you voluntarily drink. It's only in rebuttal that they make one statement acknowledging that the state has to prove, quote, a mens rea, and the defense is being honest when they say that we have to prove this. And I think that's not enough when the jury is specifically being told, if you're confused about the law, don't worry about arguments, look at what the judge gives you. And what the judge gave, led into this error by the state, was this improper non-IPI defying something irrelevant to this case. Now the evidence on intent was close, where you had, there was really, the evidence on intent were the two comments. Ms. Beard's statement that her son had called her and then handed the phone to Mr. Stamps, and Ms. Goodwin-Brown's statement that Estill Stamps said, that's what you get. But it's important that this threat over the phone to the student's mother comes from a highly biased witness, who of course wants to get justice for her son, who has undoubtedly tragically died. But this statement could not be corroborated by phone records. The witness, Ms. Brown, attempted to corroborate it, but later it was in a cross-examination, that she didn't actually know who was on the phone with the man when they were talking, and I believe said that she didn't see Mr. Stamps speak on the phone. Time's up, counsel. We would ask that you reverse. All right. Thank you. Thank you for your arguments, for your briefs. We'll take this case under advisement.